IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

KEVIN A. R.,

                        Plaintiff,

            v.                                    Civil Action No.
                                                  6:21-cv-0881 (DNH/DEP)

KILOLO KIJAKAZI, Acting Commissioner
of Social Security,

                        Defendant.

_____

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF

OFFICE OF PETER M.                    B. BROOKS BENSON, ESQ.
HOBAICA, LLC
2045 Genesee Street
Utica, NY 13501

FOR DEFENDANT

SOCIAL SECURITY ADMIN.                AMY BLAND, ESQ.
6401 Security Blvd.
Baltimore, MD 21235


DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

    Plaintiff has commenced this proceeding, pursuant to 42 U.S.C. §

405(g), to challenge a determination of the Commissioner of Social

Security ("Commissioner") finding that he was not disabled at the relevant times and, accordingly, is ineligible for the disability insurance benefits ("DIB") for which he has applied.  The matter has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3.  For the reasons set forth below, I recommend a finding that the Commissioner's determination resulted from the application of proper legal principles and is supported by substantial evidence.

I.    BACKGROUND

Plaintiff was born in May of 1970, and is currently fifty-two years of age.  He was forty-eight years old on June 25, 2018, the date upon which he allegedly became disabled.  Plaintiff stands five feet and ten inches in height, and weighed approximately two hundred and eighty-two pounds during the relevant time period.  He lives in a two-story house with his fiancé and his dog in Utica, New York.

Plaintiff reports having obtained a GED and a diploma in business management from a two-year college.  He previously worked as an office manager at a garage that also sold used cars, as well as for a rental car company.

Plaintiff alleges that he suffers from constant pain primarily in his left

leg and hip, fatigue, and depression.  Plaintiff has treated for his conditions throughout the relevant period with Dr. Dominic Aiello, Dr. Richard Chmielewski, Dr. Michael Redner, Central New York Brain and Spine Neurosurgery, Hamilton Orthopedics, and various local emergency room departments.  He also received physical therapy for a left knee injury in July and August of 2019.  Plaintiff testified that he has not received any counseling or medication for his depression, which he alleges is primarily caused by his pain and inability to do activities he once enjoyed.

Plaintiff claims that he is in constant pain that causes difficulty sleeping and doing many activities.  He testified that he is still able to drive, but it can be difficult if his leg is bothering him, which is most of the time. Plaintiff's bedroom is downstairs in his house, and even performing tasks like going to the basement to do laundry causes him to become fatigued and experience pain.  According to the plaintiff, Dr. Chmielewski recommended that he use a cane, which he began doing in April or May of 2019.  In his written function report, plaintiff stated that he can let his dog out into the yard when needed but his fiancé otherwise takes care of the dog.  He reported having no difficulties with personal care other than some problems toileting when he has pain, that he can prepare food in the microwave but otherwise his fiancé prepares his meals, that he does not do

3

yardwork, that he can go outside daily, and that he is able to drive, shop on the computer, watch television, socialize with others, and go to sport events a few times per year.

## II.   PROCEDURAL HISTORY

### A.   Proceedings Before the Agency

Plaintiff applied for DIB payments under Title II of the Social Security Act on September 10, 2018.[1]  In support of his application, he claimed to be disabled due to fibromyalgia and diabetes.

A hearing was conducted on July 22, 2020, by Administrative Law Judge ("ALJ") Robyn L. Hoffman, to address plaintiff's application, at which plaintiff appeared without representation and waived his right to postpone the proceedings to allow for him to obtain representation.  Following that hearing, ALJ Hoffman issued an unfavorable decision on September 29, 2020.  The Social Security Appeals Council ("Appeals Council") denied plaintiff's request for review of the ALJ's decision on June 7, 2021.

### B.   The ALJ's Decision

In her decision, ALJ Hoffman applied the familiar, five-step sequential test for determining disability.  At step one, she found that plaintiff had not

---

[1]      Plaintiff's date last insured ("DLI") for benefits under Title II was December 31, 2019.

4

engaged in substantial gainful activity during the relevant period.  The ALJ

next found at step two that plaintiff suffers from medically determinable

impairments that impose more than minimal limitations on his ability to

perform basic work functions, including degenerative disc disease of the

lumbar spine and obesity.  As part of her step two finding, ALJ Hoffman

found that plaintiff's hypertension, diabetes, left knee injury, and depressive

disorder were all non-severe impairments, and that his reported

fibromyalgia was not a medically determinable impairment.

At step three, ALJ Hoffman examined the governing regulations of

the Commissioner setting forth presumptively disabling conditions (the

"Listings"), *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, and concluded that

plaintiff's conditions do not meet or medically equal any of the listed

conditions set forth in the Commissioner's regulations, specifically

considering Listings 1.00, 1.04, 11.00, and 14.00.  The ALJ also considered

plaintiff's obesity pursuant to Social Security Ruling ("SSR") 19-2p.

ALJ Hoffman next surveyed the available record evidence and

concluded that plaintiff retains the residual functional capacity ("RFC") to

perform a range of work at the light exertional level with the following

additional limitations:

> the claimant could occasionally lift and carry twenty
> pounds; frequently lift and carry ten pounds; sit for up

to six hours, total; and stand or walk for six hours, total, all in an eight-hour workday, with normal breaks. He could occasionally climb ramps, stairs, ladders, ropes, or scaffolds. The claimant could perform occasional stooping, kneeling, crouching, and crawling.

ALJ Hoffman went on to step four and concluded that plaintiff is unable to perform his past relevant work.  Proceeding to step five, the ALJ concluded that significant numbers of jobs existed in the national economy that plaintiff remains able to perform based on Medical-Vocational Guideline Rule 202.21.  In making that finding, she discussed how plaintiff's documented nonexertional limitations would not erode the occupational base of light work, relying on SSRs 83-14 and 85-15.  Based upon these findings, ALJ Hoffman concluded that plaintiff was not disabled during the relevant period.

C.    This Action

Plaintiff commenced this action on August 4, 2021.[2]  In support of his challenge, plaintiff argues that the ALJ erred by failing to (1) properly evaluate and consider the limiting effects of his chronic fatigue syndrome and fibromyalgia, (2) properly evaluate the opinion from treating physician

---

[2]    This action is timely, and the Commissioner does not argue otherwise.  It has been treated in accordance with the procedures set forth in General Order No. 18. Under that General Order, the court treats the action procedurally as if cross-motions for judgment on the pleadings have been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Dr. Michael Redner, (3) consider plaintiff's hearing testimony in her

decision and to provide a sufficient rationale regarding plaintiff's subjective

allegations as required by SSR 16-3p, and (4) obtain testimony from a

vocational expert regarding other available work that plaintiff can perform in

the national economy.  Dkt. No. 13.

Oral argument was conducted in this matter, by telephone, on

November 1, 2022, at which time decision was reserved.

III.    DISCUSSION

A.    Scope of Review

A court's review under 42 U.S.C. § 405(g) and 1383(c)(3) of a final

decision by the Commissioner is subject to a "very deferential" standard of

review, and is limited to analyzing whether the correct legal standards were

applied, and whether the decision is supported by substantial evidence.

*Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012);

*Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater*, 221

F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir.

1998).  Where there is reasonable doubt as to whether an ALJ has applied

the proper legal standards, the decision should not be affirmed even

though the ultimate conclusion reached is arguably supported by

substantial evidence.  *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

If, however, the correct legal standards have been applied, and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision will withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact. *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 390, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord, Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003). To be substantial, there must be "more than a mere scintilla" of evidence scattered throughout the administrative record. *Richardson*, 402 U.S. at 401 (internal quotation marks omitted); *Williams*, 859 F.3d at 258. "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis on the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *Mongeur v. Hechler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).

B.    Disability Determination: The Five-Step Evaluation Process

The Social Security Act ("Act") defines "disability" to include the

"inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months[.]"  42 U.S.C. §

423(d)(1)(A).  In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [be] of
> such severity that he is not only unable to do his
> previous work but cannot, considering his age,
> education, and work experience, engage in any other
> kind of substantial gainful work which exists in the
> national economy, regardless of whether such work
> exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.

Id. § 423(d)(2)(A).

The agency has prescribed a five-step evaluative process to be

employed in determining whether an individual is disabled.  See 20 C.F.R.

§§ 404.1520, 416.920.  The first step requires a determination of whether

the claimant is engaged in substantial gainful activity ("SGA"); if so, then

the claimant is not disabled, and the inquiry need proceed no further.  Id.

§§ 404.1520(b), 416.920(b).  If the claimant has not worked at a level

constituting SGA, then the second step involves an examination of whether

the claimant has a severe impairment or combination of impairments that significantly restricts his or her physical or mental ability to perform basic work activities. *Id.* §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations. *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1.  If so, then the claimant is "presumptively disabled." *Martone v. Apfel*, 70 F. Supp. 2d 145, 149 (N.D.N.Y. 1999) (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(e), (f), 416.920(e), (f). If it is determined that it does, then as a final matter, at step five the agency must examine whether the claimant can do any other work. *Id.* §§ 404.1520(g), 416.920(g).

The burden of showing that the claimant cannot perform past work lies with the claimant. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584.  Once that burden has been satisfied, however, it becomes incumbent on the agency to prove that the claimant is capable of performing other available work. *Perez*, 77 F.3d at 46.  In deciding whether

that burden has been met, the ALJ should consider the claimant's RFC,

age, education, past work experience, and transferability of skills. *Ferraris*,

728 F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

    C.    <u>Analysis</u>

        1.    <u>The ALJ's Assessment of Alleged Chronic Fatigue<br>Syndrome and Fibromyalgia</u>

Plaintiff first argues that the ALJ erred by failing to evaluate his

impairments of chronic fatigue syndrome ("CFS") and fibromyalgia, either at

all or in accordance with the relevant SSRs applicable to those conditions.

Specifically, plaintiff argues that the ALJ should have found that both CFS

and fibromyalgia are medically determinable impairments because the

medical treatment records document all of the requisite signs and

symptoms attributable to those conditions.

        a.    <u>CFS</u>

Plaintiff points to a host of statements and findings from records in an

effort to support his argument that CFS is a medically determinable

impairment, but overlooks a key criteria of the evaluation: whether a

physician ever actually diagnosed plaintiff with CFS. SSR 14-1p makes

clear that a diagnosis from an acceptable medical source is a prerequisite

for finding that a medically determinable impairment of CFS exists,

providing in relevant part that

> [w]e will find that a person has an MDI of CFS *if a licensed physician diagnosed CFS*, and this diagnosis is not inconsistent with the other evidence in the person's case record.  Under the CDC case definition, a physician can make the diagnosis of CFS based on a person's reported symptoms after ruling out other possible causes for the person's symptoms.  However, as mentioned, statutory and regulatory provisions require that, for evaluation of claims of disability under the Act, there must also be medical signs or laboratory findings before we may find that a person has an MDI of CFS.

*See* SSR 14-1p (emphasis added).  Because I can find no diagnosis of chronic fatigue syndrome documented anywhere in the record, and indeed plaintiff himself never even alleges that he was provided with any such diagnosis, there was no error in the ALJ's failure to assess whether plaintiff had a medically determinable impairment of CFS.  *See Scott H. v. Saul*, 2021 WL 2379420, at *3-4 (D. Minn. June 10, 2021) (finding no error in failure to conduct analysis under SSR 14-1p where the plaintiff had never alleged CFS as an impairment, there were other alleged impairments that reasonably could have been the cause of his reported fatigue and other symptoms, and he was never formally diagnosed with CFS).

Notably, plaintiff did allege that he suffers from fibromyalgia, and, as will be discussed further below related to that impairment, the ALJ performed an analysis of whether fibromyalgia was a medically determinable impairment under the SSR applicable to that condition.

Administrative Transcript ("AT") at 16.[3]  The fact that CFS is listed as a co-occurring condition to fibromyalgia and that there is "considerable overlap of symptoms" between those two conditions does not mean that the ALJ was required to assess plaintiff's symptoms as possible CFS where plaintiff himself had never claimed to suffer from that condition and no diagnosis or even mention of that condition was made by any medical source.  SSR 14-1p.

While acknowledging that there has been no diagnosis of CFS from any medical source, plaintiff argues, based on the evidence documenting the signs that that impairment likely existed but was simply not yet diagnosed, that remand is required for further development of the record, specifically for the purpose of eliciting a statement from treating physician Dr. Redner as to whether or not he believes plaintiff has CFS, and to obtain older records from Dr. Redner to determine whether "there may be diagnoses and findings on exam . . . relevant to plaintiff's CFS."  Dkt. No. 13, at 18.  This argument is unavailing.  Most notably, although plaintiff has reported or been observed to have various signs and symptoms included in the criteria for CFS on discrete occasions, there is very little in the medical

---

[3]    The administrative transcript is found at Dkt. No. 10, and will be referred to throughout this decision as "AT __."

record, particularly the treatment records from Dr. Redner, that indicate the

ALJ failed to properly develop the record in this case.[4]

It must be emphasized that the ALJ's duty to develop the record is a

relatively narrow one.  Fundamental to the disability regulations is the tenet

that the primary responsibility for the development of evidence is on the

claimant.  SSR 17-4p. All that the regulations require of the agency is to

"develop a complete 12-month medical history when [it makes] a

determination about whether an individual is under a disability, and to make

every reasonable effort to obtain from a claimant's treating source all

medical evidence that [it needs] to make a determination."  SSR 17-4p.

Recontacting a medical source or otherwise further developing the record

can be indicated where there is insufficient evidence to determine whether

a claimant is disabled.  20 C.F.R. § 416.920b(b)(2).  Undeniably, the duty

to develop the record is heightened where, as here, the claimant is

unrepresented before the ALJ, in that the ALJ must ensure to "adequately

protect a *pro se* claimant's rights by ensuring that all of the relevant facts

are sufficiently developed and considered" and to "scrupulously and

---

[4]      Plaintiff's argument also overlooks the fact that he bears the burden of establishing the existence of an impairment and the limitations that result from it.  *Plant v. Comm'r of Soc. Sec.*, 2012 WL 2571265, at *2 (N.D.N.Y. July 2, 2012) (citing *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)).

conscientiously probe into, inquire of, and explore for all the relevant facts."

*Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009).

I find that the ALJ did not commit any error in failing to obtain more remote records from Dr. Redner or to seek additional evidence from Dr. Redner, including specifically as to whether or not he would diagnose plaintiff with CFS.  There is no indication that the ALJ failed to develop the record for the twelve-month period preceding the alleged onset date or date of application, as required by the regulations.  As to plaintiff's arguments regarding the possibility that older treatment records from Dr. Redner might reveal information or diagnoses in support of CFS, I note that, in his medical source statement from November of 2018, Dr. Redner stated that he began treating plaintiff in August of 2017.  AT 391.  Although the administrative transcript does not specifically document treatment notes from Dr. Redner dating back that far, it does contain treatment notes from that time period from Dr. Chmielewski who, I note, treated plaintiff at the same medical practice as Dr. Redner.  Plaintiff himself testified at the hearing that his primary doctor "is Redner or Chmielewski, at the Falcon Clinic," that Dr. Redner is Dr. Chmielewski's "partner at Falcon Clinic," that both are primary doctors that he might see there, and that, by the time of the hearing, he was being treated by Dr. Redner more frequently than by

Dr. Chmielewski.  AT 131, 134-35.  Because it is clear that Dr. Redner and

Dr. Chmielewski provided plaintiff's care in a more or less cooperative

manner at the Falcon Clinic, and because the evidence provided from the

Falcon Clinic appears to document findings and reports back through

August 2017, there does not appear to be any gap in the record for the time

Dr. Redner appears to have been co-treating plaintiff with Dr. Chmielewski.

 I note, moreover, that in his 2018 opinion, Dr. Render lists various

diagnoses of low back pain, left hip pain, polyarthritis, diabetes,

hypertension, gastroesophageal reflux disorder, obesity, and allergic

rhinitis.  AT 391.  Although he does list symptoms such as muscle cramps,

chronic fatigue, musculoskeletal pain, and radiating lower back pain, he

does not indicate that plaintiff has a specific diagnosis of CFS, or that these

symptoms are not attributable to the other diagnoses listed.  AT 391.

Indeed, although Dr. Redner documents in detail plaintiff's reports of

fatigue with heavy exertion, cognitive deficits, and muscle aches or

weakness, at no point does he connect those symptoms to any suspicion of

CFS.  I find no support for plaintiff's argument that an ALJ errs in failing to

recontact a physician to ask whether the claimant suffers from a certain

impairment when that physician has never diagnosed the claimant with that

condition despite having considered all of the evidence that would have

been relevant to making such a diagnosis.  Simply put, given that Dr.

Redner was well-aware of plaintiff's reported symptoms and had conducted

assessments of plaintiff at multiple appointments, one would reasonably

expect that Dr. Redner would have documented any diagnosis or even

concerns of CFS, including at a minimum, a note to rule out CFS, if he

believed that such was warranted during the relevant time.  Based on the

above, I find that the ALJ did not err related to either development of the

record or in failing to conduct an analysis of CFS under SSR 14-1p.

      b.   <u>Fibromyalgia</u>

Plaintiff similarly contends that the ALJ erred in finding that

fibromyalgia did not constitute a medically determinable impairment,

arguing that the medical record documents the requisite signs and

symptoms associated with that impairment.  Dkt. No. 13, at 19-21.  In her

decision, the ALJ acknowledged that "[t]he record reflects a reported

history positive for fibromyalgia," but noted that there was an "absence of

substantiating evidence during the period at issue" from which that

condition could be established as a medically determinable impairment.  AT

16. The ALJ stated that "[t]he record does not establish repeated

manifestations of six or more of the required fibromyalgia symptoms,"

specifically noting that examinations showed only one tender point, and

concluded that, "[d]ue to a lack of objective medical evidence, the claimant's fibromyalgia does not reach the threshold of a medically determinable impairment." *Id.*

In order to establish a medically determinable impairment of fibromyalgia, SSR 12-2p requires evidence from a medically acceptable source, which shows both a diagnosis of fibromyalgia and that the claimant meets the specific criteria of either of the two sets of criteria recognized by the agency.  The first set of criteria, known as the 1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia, requires that the claimant has all three of the following: (1) a history of widespread pain for at least three months; (2) at least eleven positive tender points on physical examination, found bilaterally and both above and below the waist; and (3) evidence that other disorders that could cause the symptoms or signs associated with fibromyalgia were excluded.  SSR 12-2p.  The second, alternate set of criteria, known as the 2010 ACR Preliminary Diagnostic Criteria, requires that the claimant has all three of the following: (1) a history of widespread pain as with the first set of criteria; (2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety

disorder, or irritable bowel syndrome; and (3) evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring  conditions were excluded.  SSR 12-2p.

I note that, as with CFS, the record does not clearly reflect whether plaintiff has ever been formally diagnosed with fibromyalgia.  Dr. Chmielewski noted in November of 2017 that he suspected plaintiff has a myofascial pain syndrome.  AT 384.  However, it is not apparent that he ever diagnosed the condition as fibromyalgia.  At the consultative examination with Dr. Elke Lorensen in January of 2019, plaintiff reported that "[h]e was told he had fibromyalgia about a year ago" and that medical marijuana was prescribed to treat his chronic pain.  AT 407.  Although Dr. Lorensen included fibromyalgia in her list of diagnoses, that appears to have been based in large part on plaintiff's uncorroborated report that he had received that diagnosis from his treating physician, as her examination revealed only a single positive trigger point, far less than the number required to substantiate fibromyalgia under the 1990 criteria.  AT 409.  I also note that, contrary to plaintiff's report that he had been diagnosed with fibromyalgia approximately a year prior to the January 2019 consultative examination, Dr. Chmielewski's treatment note from October 25, 2018, only a few months prior, indicates that, on that date, plaintiff "inquire[d] whether

or not he could have fibromyalgia," which suggests he in fact had not been diagnosed as such up to that point.  AT 383.

Further, even if Dr. Lorensen's diagnosis would be considered sufficient, SSR 12-2p makes clear that an ALJ "cannot rely upon the physician's diagnosis alone" to find that fibromyalgia is a medically determinable impairment, but rather "[t]he evidence must document that the physician reviewed the person's medical history and conducted a physical examination."  SSR 12-2p.  Specifically, the record must also contain evidence from that physician that corroborates the diagnosis in light of the two accepted sets of criteria for diagnosing fibromyalgia, as well as evidence that shows that diagnosis is not inconsistent with the other evidence in the record.  SSR 12-2p.  As was already discussed, Dr. Lorensen's examination fails this test as to the first set of criteria, which requires at least eleven positive tender points on physical examination; Dr. Lorensen observed only one such tender point.  AT 409.  I note that Dr. Lorensen's examination also does not document the requisite signs and symptoms related to the second set of diagnostic criteria, which involves the presence of six or more various signs and symptoms.  SSR 12-2p; AT 407-10.

To the extent that plaintiff argues that his medical records as a whole

show the constellation of signs, symptoms, and co-occurring conditions that substantiate fibromyalgia under the second set of criteria, I find plaintiff's argument not to be persuasive.  In support of his position, plaintiff points to various signs and symptoms like muscle pain, muscle weakness, numbness, tingling, insomnia, heartburn, and depression, as well as other signs and symptoms discussed related to CFS such as fatigue, cognitive slowing, generalized joint and muscle pain, muscle stiffness and cramping, trouble sleeping, post-exertional malaise, and chronic upper respiratory symptoms.  However, many of these citations are made out of context.  A review of the medical record substantiates that many of these signs and symptoms were associated with other medically determinable impairments. Specifically, the issues in plaintiff's lower back and left hip and leg, including pain and muscle cramping, were attributed to his lumbar spinal degeneration, other left leg symptoms in 2019 were attributed to his left knee injury, trouble sleeping was attributed to his low back and leg pain generally, and chronic sinus issues were noted to be related to his being a smoker.  Other alleged signs and symptoms do not appear to be documented on a repeated basis, even through subjective reports.  As SSR 12-2p makes clear, fibromyalgia is a diagnosis of exclusion, such that one of the explicit criteria is that "[e]vidence that other disorders could cause

these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded."  SSR 12-2p.  Because the record reasonably does not document that the majority of the signs and symptoms plaintiff cites could not be or were not related to the other impairments recognized by the treating physicians, plaintiff has not shown that the ALJ erred in finding that the record does not corroborate Dr. Lorensen's bare diagnosis of fibromyalgia under the requirements of SSR 12-2p.

Lastly, I note that, although the ALJ found that fibromyalgia was not a medically determinable impairment, and although I find that there was no need to consider the alleged CFS, the ALJ did nonetheless take into account plaintiff's reported symptoms like fatigue and pain when she continued with her evaluation of the other medically determinable impairments at the remaining steps of the sequential disability evaluation. Notably, the ALJ discussed plaintiff's reports of pain, his reported relief with various treatment modalities, and the fact that "[f]atigue and general deconditioning secondary to obesity . . . decrease the claimant's physical abilities beyond the effects of his spinal impairment alone."  AT 18-19. Such symptoms were therefore accounted for, whether or not the ALJ credited any notions of possible fibromyalgia or CFS.

Based on the foregoing, the ALJ's assessment of plaintiff's

22

fibromyalgia, and her failure to consider whether plaintiff might have CFS, are supported by substantial evidence, and no error is apparent.

      2.    <u>The ALJ's Assessment of Dr. Redner's Opinion</u>

Plaintiff next argues that the ALJ failed to properly assess the opinions submitted by treating physician Dr. Michael Redner, asserting that the rationale provided by the ALJ for finding those opinions to be not wholly persuasive is inaccurate and unsupported by the evidence in the record. Dkt. No. 13, at 21-24.

In a medical source statement from November of 2018, Dr. Redner opined that plaintiff can lift and carry twenty-five pounds occasionally and ten pounds frequently, with a maximum weight that can be lifted or carried of thirty pounds; is able to stand or walk up to two hours in an eight-hour workday; can sit less than six hours in an eight-hour workday; is limited to pushing and pulling only for short intervals; and has no limitations related to postural, manipulative, visual, communicative or environmental abilities. AT 392.

In a second medical source statement from December of 2019, Dr. Redner opined that plaintiff can lift up to twenty pounds occasionally and up to ten pounds frequently; can carry up to twenty pounds occasionally; is able to sit, stand and walk each for thirty minutes at one time and total in an

eight-hour workday; and can ambulate without the use of a cane.  AT 490.

He further opined that plaintiff can occasionally reach overhead and

frequently reach in all other directions; must never operate foot controls

due to his lumbar spine issues; can occasionally climb ramps and stairs

and crawl; can never climb ladders or scaffolds, balance, stoop, kneel and

crouch; is able to frequently have exposure to respiratory irritants and

extreme temperatures; can occasionally operate a motor vehicle; must

never have exposure to unprotected heights, moving mechanical parts, and

vibrations; and cannot walk a block at a reasonable pace on a rough or

uneven surface.  AT 491-94.  Dr. Redner specifically cited to plaintiff's

lumbar spine imaging to explain these opinions, and opined that plaintiff

requires "constant rotation between all [sitting, walking, and standing] as

well as supine rest on firm flat surface."  AT 490-93.

     The ALJ found Dr. Redner's opinions to be only somewhat

persuasive, weighing his treatment relationship in favor of persuasiveness

and finding that the opined lifting restrictions are consistent with the

evidence.  AT 20.  She found, however, that the limitations for standing and

walking are not supported and inconsistent particularly with records

showing normal ambulation in 2018.  *Id.*  She further found that his opinion

regarding a need for position changes appears to be based primarily on

plaintiff's subjective reports and is not consistent with the overall record, including evidence that plaintiff's knee injury improved within a fairly short period with only conservative care.  *Id.*  The ALJ also pointed generally to treatment notes documenting normal spine range of motion without radicular symptoms, and plaintiff's own reports that he benefitted from pain relief treatments, was able to walk "quite a bit" and was consequently losing weight, and was able to drive a car, which indicates he does not have significant limitations for stooping or use of foot controls.  *Id.*

Regarding plaintiff's abilities to stand and walk, I note that Dr. Redner's two opinions, which are from approximately a year apart, are vastly different in the ranges of limitation they describe.  There appears to be no dispute even from plaintiff that Dr. Redner's 2019 opinion that plaintiff can only stand or walk for thirty minutes each total in an eight-hour workday was properly found to be unpersuasive by the ALJ, as such an extreme limitation is clearly unsupported by the totality of the record, including plaintiff's own reports of daily activities.  Plaintiff does argue, however, that the ALJ erred in failing to adopt Dr. Redner's 2018 opinion that he can stand or walk for only two hours in an eight-hour workday, asserting that the ALJ's citation to "normal ambulation" in 2018 and finding that the opinion is poorly supported misrepresents or misinterprets the record

evidence. Dkt. No. 13, at 21-22. I find, however, that the record does not undermine the ALJ's findings or rationale. Notably, treatment notes in 2017 and 2018 from both Dr. Aiello and Dr. Chmielewski generally revealed normal examinations. *See* AT 373, 375, 378, 381, 387-88, 531. Dr. Chmielewski did observe some lumbar paraspinal hypertonicity and tenderness over the right SI joint in October of 2017, which was improved somewhat with manipulation therapy, although plaintiff continued to display reproducible left hip tenderness. AT 384-85. In November of 2017, Dr. Chmielewski noted that plaintiff's left hip was generally normal with no loss of range of motion and normal strength and sensation, although he did display "some tenderness in his left sacroiliac and left gluteal area. AT 384. In the relevant period, on November of 2018, plaintiff reported his pain was making him miserable and irritable, yet he was observed as having only discrete point tenderness over the left hip and left trochanteric bursa with normal strength, range of motion, sensation, and gait. AT 394, 399. Multiple examinations in February 2019 revealed no abnormal findings. AT 435, 441-42, 540.

In March of 2019, plaintiff was observed to be walking with a limp, but the remainder of the physical examination was normal other than mild tenderness in his left buttock and trochanteric region and mild discomfort

with straight leg raising.  AT 424-25, 429-30.  He received an epidural steroid injection at L5-S1 in April of 2019, and subsequent treatment in 2019 primarily focuses on a left knee injury sustained in June of 2019.  *See* AT 444, 515, 543, 545, 611-16, 623, 629, 632.  In December of 2019, plaintiff was observed to have mild low back discomfort with straight leg raising.  AT 504.  Subsequent treatment in 2020, which is after plaintiff's DLI, also did not reveal abnormal symptoms with his low back or left leg. AT 593, 600.

In her decision, the ALJ provided a thorough assessment of the treatment evidence, which demonstrates that she carefully considered all of this evidence when determining the persuasiveness of Dr. Redner's opinions, and I discern no misinterpretation or misrepresentation of that evidence.  AT 18-19.  The treatment evidence supports the ALJ's finding that plaintiff was generally observed to be ambulating normally during examinations, and that, overall, the treatment record does not support an ability to stand or walk for only two hours in an eight hour workday, given that on the occasions when symptoms were observed, they were noted to be mild.  The fact that the reports of magnetic resonance imaging ("MRI") testing suggest that plaintiff had areas of fairly severe degeneration or narrowing does not automatically translate into a need for extreme

27

restrictions.  The ALJ considered both the MRI findings and the treatment records that documented very few functional abnormalities with plaintiff's lumbar spine and left hip.  I find that the ALJ's determination that the standing and walking restrictions opined by Dr. Redner were poorly supported is supported by substantial evidence.  *See Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626, 649 (S.D.N.Y. 2019) ("If the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists."); *accord James P. v. Berryhill*, 18-CV-0397, 2020 WL 137241, at *8 (N.D.N.Y. Jan. 13, 2020) (Baxter, M.J.).

The ALJ did acknowledge that plaintiff's left knee injury in June 2019 temporarily caused difficulties with his ability to ambulate, but ultimately found that such difficulties were relieved in a relatively expeditious manner through injections and physical therapy, such that by December of 2019 he was no longer using a cane and, with the exception of a single acute exacerbation, left knee examinations were generally back to normal.  AT 14, 17, 503, 548, 593, 635.  The ALJ ultimately found plaintiff's knee impairment to be non-severe because it resolved within twelve months without any evidence of ongoing complications or functional restrictions,

although she did indicate that she included postural restriction in the RFC to account for any related effects of that impairment.  Plaintiff has not challenged that finding and I therefore find that the evidence related to plaintiff's left knee injury does not serve to support his argument that greater restrictions in standing and walking were warranted.

As to the opinion regarding position changes, the ALJ found that such limitation appears to be based primarily on plaintiff's subjective reports rather than Dr. Redner's own expert medical opinion and also is not consistent with the overall medical record including notations of normal spine range of motion, plaintiff's reports of benefit from pain treatments, indications he was able to walk more after his knee injury healed, and reports that he was able to drive a car.  AT 20.  A review of Dr. Redner's treatment notes show that they document subjective reports of functional limitations, including a reported need to alternate between sitting, standing, and walking at intervals of thirty minutes, which are essentially consistent with the restrictions Dr. Redner ultimately included in his medical source statement.  AT 594.  This supports the ALJ's finding that Dr. Redner's opinion may not have been based on his own objective assessment of plaintiff's functional capabilities. Notably, the same treatment note that documents those functional reports indicates that plaintiff's then-active left

knee injury was contributing to his difficulties standing and walking. *Id.*
However, prior to that injury in late April of 2019, plaintiff had reported that
treatments such as CBD vapor, muscle manipulation, and injections for his
lumbar spine had been generally working well at various times to relieve his
pain. AT 584, 595-96.

The treatment provided to the plaintiff in 2019 was broadly related to
his knee rather than his back or hip, while treatment notes from 2018 do
not document ongoing reports of needing to change positions, and he was
generally noted to be in no acute distress without indications of needing to
change positions during medical appointments. *See e.g.*, AT 530, 534, 539,
542, 581-82, 586-87, 595-96. It was noted in November of 2018 that
plaintiff reported his pain is relieved by frequent movement and that he is
not able to watch a movie at a theatre because of needing to change
positions. AT 499. However, taken in context with the rest of the treatment
notes, this appears to have been during a period when he was
experiencing an exacerbation of his pain. AT 499. After reviewing all of
the evidence, although recognizing that there is some evidence to suggest
a need for changing positions, substantial evidence supports the ALJ's
finding that the limitation in Dr. Redner's opinion is not generally consistent
with the evidence in the record as a whole.

Plaintiff also challenges the ALJ's rejection of Dr. Redner's extreme limitations related to postural activities and use of foot controls. As to the use of foot controls, the ALJ specifically noted that the opined limitation related to never using foot controls is inconsistent with plaintiff's own reports that he is able to drive.  AT 20.  This finding is supported by the record.  Although plaintiff reported at the hearing that driving had become difficult by that point because of his frequent left hip and back pain, treatment records indicate that he reported in August of 2018 that he had at some point within the previous month driven across the country in memory of his recently deceased father, an endeavor that clearly undermines his claimed inability to use foot controls.  AT 383.  I note also that, even if plaintiff's ability to drive had decreased by the time of the administrative hearing, that hearing occurred approximately seven months after his DLI, and evidence from 2019 and prior does not document any worsening within the relevant period.

In rejecting more restrictive postural limitations, the ALJ noted things like the generally normal range of motion observed on examinations of the plaintiff and specifically indicated that the postural limitations she did include in the RFC were meant to account for any possible impact from plaintiff's 2019 knee injury, but that "[f]urther restrictions, however, are not

supported by the limited positive objective findings in evidence." AT 18. As

has already been discussed, the record shows very few functional

abnormalities related to plaintiff's spine, documenting generally normal

spinal range of motion with only mild tenderness. Dr. Lorensen indicated

that plaintiff declined to perform many of the tests that would be indicative

of his postural abilities, although she did note that he was able to get on

and off the examination table and rise from his chair without difficulty. AT

408. He was also observed to move well and briskly with no apparent pain

or distress. *Id.* The ALJ ultimately found that plaintiff can only occasionally

perform the various relevant postural maneuvers. AT 17. Because the ALJ

found that the record as a whole does not support greater limitations than

already accounted for, I find that her rejection of the greater limitations

opined by Dr. Redner as unpersuasive is supported by substantial

evidence.[5]

### 3.    The ALJ's Assessment of the Subjective Reports

Plaintiff next argues that the ALJ erred when assessing his subjective

reports because she failed to fully consider his hearing testimony. Dkt. No.

13, at 25. However, the fact that the ALJ may not have discussed or

---

[5]    I note that Dr. Redner's 2018 medical source statement specifically indicated that
he believed plaintiff had no limitation in his ability to perform postural activities. AT 392.

recited plaintiff's hearing testimony in detail does not mean that she failed to consider it.  *See Brault*, 683 F.3d at 448 (indicating that an ALJ is not required to discuss or cite every piece of evidence to show that it was considered).  Further, plaintiff does not argue what reports were made at the hearing that showed a worsening from the time when he completed his written function report or otherwise indicated greater functional restrictions. Because I can discern no obvious reason that a failure to explicitly discuss plaintiff's hearing testimony would render the ALJ's analysis questionable, I find that plaintiff's argument does not provide a basis for remand.

I note also that the ALJ provided multiple reasons for declining to adopt plaintiff's subjective reports of symptoms wholesale, including that they were not consistent with the medical evidence, the fairly conservative nature of his care and treatment, his own reports that treatments such as CBD oil, medical manipulation, physical therapy, pain medications, and spinal injections all improved his pain, the fact that he drove on a cross-country road trip during the relevant period despite his allegations that driving was difficult because of his pain, and the fact that his spinal condition did not result in the use of either a cane or a back brace.  AT 17-19.  Plaintiff does not challenge any of these reasons and I see no error in the ALJ's rationale, which is supported by the evidence of record.  I note

also that it is well-established that, in the absence of notable error or lack of

substantial evidence in support, "[a]n ALJ's evaluation of a social security

claimant's subjective symptoms is entitled to substantial deference by a

reviewing court." *Edward J. v. Kijakazi*, 21-CV-0150, 2022 WL 4536257, at

*6 (N.D.N.Y. Sept. 28, 2022) (Stewart, M.J.) (internal quotation marks

omitted); *see Aponte v. Sec'y, Dept. of Health and Human Servs.*, 728 F.2d

588, 591 (2d Cir. 1984) (noting that "[i]f the Secretary's findings are

supported by substantial evidence, . . . the court must uphold the ALJ's

decision to discount a claimant's subjective complaints of pain").  I

therefore find no error in the ALJ's assessment of plaintiff's subjective

reports.

### 4.    The ALJ's Step Five Findings

Plaintiff lastly argues that the ALJ erred at step five by not eliciting

testimony from a vocational expert because (a) it is not clear what the

effect on the occupational base of work would be of the opinion from

consultative examiner Dr. Corey Anne Grassl that plaintiff is moderately

limited in his ability to sustain concentration, perform a task at a consistent

pace, and sustain an ordinary routine and regular attendance at work, and

(b) it is not clear how the need to change positions opined by Dr. Redner

would affect the occupational base of work available in the national

economy.  Dkt. No. 13, at 25-28.

Both of these arguments are premised on restrictions contained within medical source statements that the ALJ ultimately found were not supported by the evidence.  As to Dr. Grassl's opinion, the ALJ acknowledged that Dr. Grassl opined certain moderate limitations, but also noted that her examination revealed no mental difficulties and that Dr. Grassl ultimately concluded that plaintiff's psychiatric problems did not appear significant enough to interfere with his ability to function on a daily basis.  AT 15, 415.  The record is devoid of any treatment for depression or any other mental health condition.  Moreover, plaintiff has not reported any difficulty maintaining concentration or in sustaining attendance or routine as a result of his depression.  AT 139.  The ALJ ultimately found that the record as a whole, including the opinions from the state agency psychological consultants, did not indicate the need for any mental limitations in the RFC, a finding that plaintiff has not directly challenged in any detail and which I find to be supported by substantial evidence. Because there is nothing to indicate the ALJ should have included a moderate limitation in accordance with Dr. Grassl's opinion, there was no need for the ALJ to consider the effect of any such limitation at step five, with or without the help of a vocational expert.

As to the need to change positions, as was already discussed above, the ALJ specifically found that such limitation was not supported by the record as a whole and therefore declined to include it in the RFC finding. Plaintiff's argument at step five is little more than a repeat of his argument that the ALJ should have found Dr. Redner's opinion more persuasive. Having already rejected that argument above, there is no need to engage in a further analysis of it here.

Based on the foregoing, I find that the ALJ did not commit any error at step five.

IV.   SUMMARY AND RECOMMENDATION

After considering the record as a whole and the issues raised by the plaintiff in support of his challenge to the Commissioner's determination, I recommend a finding that the Commissioner's determination resulted from the application of proper legal principles and is supported by substantial evidence.  Accordingly, it is hereby respectfully

RECOMMENDED that the Commissioner's decision be AFFIRMED, defendant's motion for judgment on the pleadings (Dkt. No. 18) be GRANTED, plaintiff's motion for judgment on the pleadings (Dkt. No. 13) be DENIED, and plaintiff's complaint be DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days

within which to file written objections to the foregoing report.  Such

objections shall be filed with the Clerk of the Court.  <u>FAILURE TO OBJECT</u>

<u>TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE</u>

<u>APPELLATE REVIEW</u>. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993)

(citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir.

1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated:     November 9, 2022
           Syracuse, NY
                                        _____
                                        DAVID E. PEEBLES
                                        U.S. Magistrate Judge